RECEIVED
FEB 13 2012
U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
DEPUTY CLERK

United States District Court
Middle District of Louisiana
FILED
February 13, 2012

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

Rayfield Joseph Thibeaux

**name of plaintiff(s)**

**CIVIL ACTION**

**versus**

**NO.________________________ )**

Burl Cain,warden, Dixon Correctional Institute; Tom Desport, Psychologist, Eastern Louisiana Mental Health Systems; Unknown Psychiatrist, Eastern Louisiana Mental Health Systems; Defendants.

**COMPLAINT**

**1. State the grounds for filing this case in Federal Court (include federal statutes and/or U. S. Constitutional provisions, if you know them):**

My claim arises in violation of the Fourth,Eight,and Fourteenth Amendment to the United States Constitution

**2. Plaintiff,** Rayfield Joseph Thibeaux **resides at**

P.O.Box 1622, Denver,
**street address** **city**

Denver, Colora, 80201, 713-422-3728
**parish** **state** **zip code** **telephone number**

**(if more than one plaintiff, provide the same information for each plaintiff below)**

**3. Defendant,** Burl Cain,warden **lives at, or its business is located at** 5568 Highway 88,
**street address**

Jackson, ______, La,
**city** **parish** **state**

70748, ______.
**zip code** **telephone number**

**(if more than one defendant, provide the same information for each defendant below)**

Tom Desport,Psychologist; 4502 HWY 951,Jackson,Louisiana;
Unknown Psychiatrist;4502 HWY 951,Jackson Louisiana

4. **Statement of claim ( State as briefly as possible the facts of your case. Describe how each defendant is involved. Include also the names of other persons involved, dates, and places. Be as specific as possible. You may use additional paper if necessary):**

I was secretly implanted with a surreptitious monitoring device while at Dixon Correctional Institute. See additonal statement attached to this complaint:

5. **Prayers for Relief (list what you want the Court to do):**

a. Jury trial

b. award damages: Monetary,Declaratory, and Punitive

c. pain and suffering;mental anguish;and

d. Injunctive relief and attorney fees

**I (we) hereby certify under penalty of perjury that the above petition is true to the best of my (our) information, knowledge, and belief.**

**Signed this** 13 **day of** Febuaray **, 20**12

Rayfield Thibeaux
P.O. Box 1622 Denver, CO 80201
Rayfield Thibeaux

**(signature of plaintiff (s))**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**
**BATON ROUGE DIVISION**

Rayfield J. Thibeaux

V. USDC No.______________

Burl Cain, warden,et al

**COMPLAINT**

Burl Cain warden of Dixon Correctional Institute in 1981 conspired with the staff of Eastern Louisiana Mental Health Systems to secretly implant a surreptitious interception monitoring device in the left cheek of my rectum. I was known as a very elusive criminal at a very young age in this state of Louisiana and some parts of Texas. The first time I was arrested was in Marksville, Louisiana. I was given a three (3) year probation sentence for a burglary I committed. Nothing was said or done about the hit and run accident I caused with my car, only one and a half miles from the burglary site ,on the same day of that burglary I was convicted for in Marksville. About six months to a year later, I was arrested again, this time in Lake Charles, Louisiana for another burglary. The three year sentence in Marksville was still running, but at first, I did not say I was on probation in Marksville, because my first name then, was spelled Raphael and not Rayfield on my driver license. The spelling was created by a catholic church, right after I was born and baptized ; Immaculate Heart of Mary church in Lafayette Louisiana .I received another three year probation sentence in Lake Charles ,Louisiana for that burglary in 1981. I was returned back to the Calcasieu Parish Jail to be released. A few hours later, I was told I had a hold on my release. Within a week, I was returned back to the Calcasieu Parish Courthouse ,the three year probation sentence was vacated from the record. I was then given a five(5) year sentence to be served in the Louisiana Department of Corrections.

Shortly after arriving at Dixon Correctional Institute in Jackson , I began to have problems with other inmates. I got into four or five fights before I was ordered to see a psychiatrist that visited the prison once a month from Eastern Louisiana Mental Health Systems . He was of Pakistani or India heritage. At the first and only appointment with the doctor, he wanted to put

me on psychiatric medication. I refused, and stated that I was only meeting with him because of a few fights. He then requested that I meet with a psychologist by the name of Tom Desport, who also visited the prison once a month from the Eastern Louisiana Mental Health Systems hospital, which is located about two miles from the prison.

After my first visit with Doctor Desport, I some how got drugged anyway ,I believe it was done through my food in the kitchen. I woke up one morning and felt a mild pain coming from the left cheek of my rectum.I went to the restroom to see what had happen and found part of a tiny black coil wire protruding from the left cheek of my rectum. It was barely noticeable .I tried to pull it out but it was too embedded to come out. I did not know what to make of it, and had no understanding of any kind of electronic communication at that time. At the same time, I was still feeling very tired and went back to bed to get more sleep. It was a Saturday and I did not have work that day.

At several of my monthly visits with Dr. Desport I would mention how I would be feeling drugged at times ,but he would never discuss the matter. He would simply ,say hello, and tape record the meeting and end the session.

I have found the tiny black coil wire secretly inserted into my rectum to be part of a monitoring system used at the Eastern Louisiana Mental System –Jackson Campus forensic unit to remotely monitor their patients mental health. Its a form of Telemedicine.

Warden Burel Cain secretly allowed the Pakistani psychiatrist and Tom Desport to conduct experiments and/or research at the prison and I am still part of that ongoing research. He allowed that device to illegally enter into a penal institution and be used for that experiment.

Tom Desport is very much a part of that illegally activity at the Louisiana Department of Corrections-Dixon Correctional Institute, his purpose was to find out what my understanding was on the incidents, before it took its place in our society. I was incarcerated at Dixon Correctional Institute for three years and four months, Tom Desport was never known to me to be anything other than a doctor. If he did not have that title, I'm sure he would not have been known by me or any of the other inmates at the prison. Unless, if He worked in the administration office at Dixon .

The Pakistani or India psychiatrist has the sole responsibility for any psychiatric medication and/or medical devices used at the Eastern Louisiana Mental Health Systems-Jackson Campus forensic unit and

illegally allowed the medication and/or devices to be used outside of the hospital. Once the fiber optic cable was inserted into my rectum, the doctor gave out the code to access the restricted area of that hospital's website, where the monitoring was taking place ,to prison guards at Dixon and that code is now in the hands of the general public .I am constantly being monitored. And Eastern Louisiana Mental Health Systems exclusive website has now been discontinued and the monitoring is being done by their intranet and/or Ethernet connection; or the Louisiana Rural Health Information Exchange which is a Telemedicine agency. There are many wireless devices on the market to the public, these days, and accessing that hospital's online site is never a problem.

## FACTUAL BACKGROUND

In electronics, whether it be basic or highly scientific, fiber optic cable would be the electronic apparatus of choice to transmit human intelligence from the body with out being disturbed ,and allow the body to live indefinite. The fiber optic cable had to be bundled together and coated with a substance called "Keviar" ,a substance manufactured by DuPont, five times stronger than
steal .

In December of 1989,the United States Patent office issued a patent for the Telemedicine instrumentation pack; Patent 5,701,904.Prior to that patent, there was a prototype;and I am on that prototype.The patent gives detailed descriptions and one is the use of the fiber optic cable. The scheme by which I am disabled is similar to that of a Television camera, transmitter, receiver, etc...Part of Warden Burl Cain's duty, by law, is law enforcement. Nonetheless, His duty does not include having me monitored and imprisoned by electronic means, without a Court Order. I am still a prisoner.

Nonetheless, I complained to the United States Social Security Administration in April of 2010, about this fiber optic cable being inserted into my rectum .In July of 2010,I was given a medical evaluation. Then in October of 2010,I was granted social security supplemental benefits. I did not claim the benefits until July 7, 2011, because I misunderstood one of two letters sent to me .One letter was denying me SSD, but the other approved of SSI, and I did not know there were a differences in the approval. And the letter did not exactly say. It just wanted me to come into the office.

## CAUSE OF ACTION

Because the human mind is a product of nature, a birth right , laws of nature and/or natural phenomena, and abstract ideas or basic human knowledge or thought, the defendants have no right to expose the plaintiff's mind to the public. Because of their cruel and unusual act, my thoughts and doings are never private.

Plaintiff Rayfield Joseph Thibeaux demands judgment against the Defendants jointly or severally as the law allows,in an amount sufficient to invoke the jurisdiction of the court, together with interest and costs for:
Monetary,
Declaratory,
Punitive damages,
Mental anguish,
Pain and suffering,
Injunctive relief,
and attorney fees.

Rayfield J. Thibeaux
Rayfield J. Thibeaux
P.O.Box 1622
Denver ,Colorado 80201

**United States Patent** **5,701,904**

**Simmons , et al.** **December 30, 1997**

## *Telemedicine instrumentation pack*

### Abstract

The invention concerns a portable medical diagnostic apparatus which includes three types of data-gathering instruments: (1) visual instruments (eg, otoscope, ophthalmoscope, rhino-laryngoscope, macro lens and fundus camera); (2) an audio instrument (eg, electronic stethoscope); and (3) data-gathering instruments (eg, pulse oximeter and ECG monitor). A video camera generates signals, based on images taken from the visual instruments. Other electronic circuitry generates signals based on output of the audio instrument and data-gathering instruments. The signals are transmitted to a remote site for analysis by medical personnel.

Inventors: **Simmons; Scott C.** (Houston, TX), **Pohl; John R.** (Friendswood, TX), **Guess; Terrell M.** (Houston, TX), **Rushing; Douglas A.** (Houston, TX), **Caputo, Jr.; Michael P.** (Hanover, NH), **Billica; Roger D.** (Houston, TX)

Assignee: **Krug International** (Houston, TX)

Appl. No.: **08/584,820**

Filed: **January 11, 1996**

| | |
|---|---|
| **Current U.S. Class:** | **600/301** ; 348/42; 348/75; 348/77; 600/358; 600/559 |
| **Current International Class:** | A61B 5/00 (20060101); A61B 3/12 (20060101); A61B 5/0404 (20060101); A61B 5/0402 (20060101); A61B 7/00 (20060101); A61B 1/227 (20060101); A61B 7/04 (20060101); A61B 1/04 (20060101); A61B 1/267 (20060101); A61B 005/02 () |
| **Field of Search:** | 128/630,637,638,670,671,672,687-689,731-733,739-741,746,748,715,772,773 600/109,110,112 |

### References Cited [Referenced By]

### U.S. Patent Documents

| | | |
|---|---|---|
| 3903871 | September 1975 | Chisum et al. |
| 4567881 | February 1986 | Heller |
| 4878501 | November 1989 | Shue |
| 5325863 | July 1994 | Pompei |
| 5327884 | July 1994 | Hardy et al. |
| 5363839 | November 1994 | Lankford |
| 5419312 | May 1995 | Arenberg et al. |
| 5441047 | August 1995 | David et al. |
| 5462051 | October 1995 | Oka et al. |
| 5527261 | June 1996 | Monroe et al. |
| 5599276 | February 1997 | Hauptli et al. |

*Primary Examiner:* Bahr; Jennifer
*Assistant Examiner:* Huang; Stephen
*Attorney, Agent or Firm:* Jacox, Meckstroth & Jenkins

## *Claims*

We claim:

1. Medical diagnostic apparatus, comprising:

a) a programmable digital computer;

b) audio means for deriving audio signals usable to a physician from selected internal physiological activity of a subject, and delivering the audio signals to the computer;

c) video means for deriving visual images from parts of the subject's physiology, and delivering video signals indicative thereof to the computer;

d) data means for deriving data signals indicative of physiological activity of the subject, and delivering the data signals to the computer; and

e) means for suppressing receipt of ambient noise by the audio means.

2. Apparatus according to claim 1, and further comprising:

f) instrumentation means for providing data indicative of

i) oxygen saturation percentage in blood;

ii) heart rate;

iii) electrocardiogram.

iv) blood pressure; and

v) temperature.

3. Apparatus according to claim 1, and further comprising

f) communication means for transmitting said audio signals, video signals, and data signals, via a telephone link, from the computer to a remote location.

4. Apparatus according to claim 1, and further comprising

f) program means, for running on the computer, which presents instructions for operation of the apparatus.

5. Apparatus according to claim 1, wherein the audio means comprises a stethoscope-microphone combination.

6. Apparatus according to claim 5, wherein the audio means further comprises an otoscope.

7. Apparatus according to claim 1, wherein the audio means comprises a stethoscope.

8. Apparatus according to claim 1, wherein the physiological activity of paragraph (b) includes heart, lung, and intestinal activity.

9. Apparatus according to claim 1, and further comprising:

h) a pulse oximeter and an electrocardiogram monitor for producing signals for the communication means to transmit to the remote location.

10. Apparatus according to claim 9, and further comprising:

i) a stethoscope which produces signals for the communication means to transmit to the remote location.

11. A medical diagnostic apparatus, comprising:

a) a video camera;

b) an otoscope;

c) an ophthalmoscope;

d) a rhino-laryngoscope;

e) macro lens

f) mounting means for mounting the otoscope, ophthalmoscope and rhino-laryngoscope to the video camera;

g) a programmable digital computer;

h) a frame-grabber card, connected to the computer, for receiving data indicative of video images from the video camera, and converting the data into digital form to the computer;

i) a stethoscope having a microphone which produces analog signals indicative of sounds which the stethoscope detects;

j) an audio digitizing card, connected to the computer, for receiving the analog signals, and converting them to digital format;

k) a pulse oximeter;

l) an electro-cardiogram (ECG) monitor;

m) blood pressure monitor;

n) temperature monitor;

o) a data input card, connected to the computer, for receiving data from the pulse oximeter and ECG monitor; and

p) display means for displaying output of the pulse oximeter, the ECG monitor, and the video camera.

12. Apparatus according to claim 11,

q) further comprising a case capable of containing all components listed in paragraphs (a) through q); and

r) in which all components within said case, plus said case itself, are subject to hand-carriage by an average human.

13. Apparatus according to claim 11, and further comprising:

n) program means, for running on said computer, which present instructions as to operation of selected components of the apparatus.

## *Description*

The invention relates to a portable medical diagnostic apparatus which contains

(a) medical instruments for examining a subject, together with

(b) a communication system for transmitting the data obtained to a remote site.

BACKGROUND OF THE INVENTION

Numerous situations arise where a basic medical examination of a subject is desired, but where medical personnel are not always available. Some examples are the following:

1. Space Exploration. The U.S. spacecraft known as the "Space Shuttle" carries a multi-person crew, but inclusion of a physician is not always feasible. However, situations can arise where a medical examination of a crew member is desirable.

2. Military Medicine. Military exercises and operations frequently occur in remote locations, where medical facilities are scarce or nonexistent.

3. Medically Under-served Areas. The number of fully staffed and equipped medical clinics in the world is relatively small, compared to the population and geographic area to be served. Frequently, a medical examination of a distant patient is desirable.

4. Emergency and Occupational Medicine. Industrial mishaps and natural disasters sometimes occur at locations where medical facilities are not available. Further, even if such a facility is nearby, the extent of damage can over-tax this facility and require assistance of a more remote facility.

5. Home Health Care. Many people recover from illness or accident in their homes, where physicians and a nursing staff are not generally available.

OBJECTS OF THE INVENTION

An object of the invention is to provide an improved medical diagnostic apparatus.

A further object of the invention is to provide a medical diagnostic apparatus which contains instruments by which a technician can perform a physical examination of a subject, and the apparatus contains a communication system that transmits results of the examination to a remote location for analysis by medical personnel.

Another object of the invention is to provide apparatus for conducting physical examinations involving observation (looking), auscultation (listening), and palpation (feeling/touching). The apparatus of the invention provides a method for physicians to remotely observe the ear, eye, skin, nose, throat, electrical activity of the heart (ECG), blood pressure, temperature, blood O.sub.2 saturation (pulse oximeter), and remotely listen to the patients voice response to questions, heart, lung, and abdominal sounds.

SUMMARY OF THE INVENTION

In one form of the invention, medical instrumentation is applied to a subject, and takes visual images of organs such as the internal eye, external eye, skin, internal ear, external ear and internal body organs, and transmits these images to a remote location for medical personnel to view.

In another form of the invention, other instrumentation takes acoustic data, as from a stethoscope, and electronic data, as from a pulse oximeter and an ECG monitor. This other data is also transmitted remotely, for display to the medical personnel.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates one form of the invention and shows a portable case or valise which carries certain medical instruments as also shown;

FIG. 1A is a view of the control panel of the valise shown in FIG. 1;

FIG. 2 is an exploded schematic of a video sub-system embodied by the invention;

FIG. 3 illustrates operation of an otoscope 20, which is part of the video sub-system;

FIG. 4 illustrates operation of an ophthalmoscope 30, which is part of the video sub-system;

FIG. 5 illustrates operation of a rhino-laryngoscope which is part of the video sub-system;

FIG. 6 illustrates an audio sub-system embodied by the invention and which includes an electronic stethoscope;

FIG. 7 illustrates a data subsystem embodied by the invention;

FIG. 8 illustrates an architecture of one form of the invention; and

FIG. 9 illustrates an architecture of another form of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 is a view of one form of the invention, and shows a valise 2 which is adapted to contain various medical instruments for use in examining a subject. The components shown in FIG. 1 will be explained with reference to FIGS. 2-7.

### Video Imaging System

A valise 2 carries a video camera 3, shown in FIG. 2, a part of which is shown in FIG. 1. The video camera 3 is a commercially available Charge-Coupled Device (CCD) camera, in which the light-sensitive imaging head 6 (shown in FIG. 1) is separate from the camera control unit (CCU), in FIG. 2. The CCU contains electronics which scan the CCD array contained in the imaging head 6, and produce the electronic signals representing the image viewed. Such apparatus is commonly called a "remote head" camera.

One reason for separating the remote imaging head 6 from the CCU is to allow the more massive CCU to remain stationary, while the more lightweight imaging head 6 is manipulated by a technician. As will be explained shortly, one of several medical instruments is affixed to the imaging head 6. The light weight of the imaging head (in the range of 1.75 ounces) does not appreciably affect the manipulability of the instruments.

Accuracy in color rendition can be important in many situations of imaging a patient. The valise 2 is equipped with a white reference 46, shown in FIG. 2, for use in adjusting color response of the video camera. A technician images the white reference 46 using the video camera, and adjusts a white balance control 49, shown in FIG. 1A, until the image shown on the display 25 in FIG. 2 produces acceptable color. White references are known in the art.

### Otoscope

The imaging head 6 in FIG. 2 can be attached to one of several medical instruments which are shown in column 11 of FIG. 2: One instrument is a video otoscope 20 which allows imaging of the ear canal and tympanic membrane, such as at imaging plane 23 in FIG. 3. The otoscope is illuminated by a fiber optic cable 31 in FIG. 2, which receives light from a light source within the valise 2, indicated as 55 in FIG. 1A, and delivers light to the imaging plane 33 in FIG. 4 by a suitable arrangement of the exit ends 31A of the optic fibers, as indicated in FIG. 4.

The video camera 3 in FIG. 2 produces an image which is displayed on a display 25. The display is a commercially available Thin-Film Transistor (TFT) flat-panel display. In addition, the video camera 3

Case 3:12-cv-00084-BAJ-SCR Document 1 02/13/12 Page 13 of 36

produces an analog signal which conforms to the NTSC standard (NTSC: National Television Standards Committee). This analog signal is delivered to a jack on the valise 2, for transmission to a remote location, as will be explained in connection with FIGS. 7 and 8.

One purpose of the display 25 is to provide feedback to the technician who is using the video camera in examining the subject. The display shows the image which the camera sees and also indicates the image which will be seen by the remote parties to whom the invention sends the video images taken.

Ophthalmoscope

A second instrument is a standard ophthalmoscope 30 shown in FIG. 2. This instrument allows imaging of the internal eye, such as at imaging plane 33 in FIG. 4. The opthalmoscope utilizes its own, standard illumination system which receives power through line 21 in FIG. 2, from a power supply (not shown) contained within the valise.

Macro Lens

A third instrument is a standard macro lens 40 shown in FIG. 2. The instrument has additional accessories such as a close-up lens 42 and a light ring 44. The macro lens 40 takes the form of a commercially available zoom lens having a field of view ranging from 1 to 100 square centimeters and an aperture ranging from F 1.8 to F 16.0.

The macro lens 40 is used for imaging the skin and superficial aspects of the physiology. For example, the macro lens can image the eye externally, at image plane 46 in FIG. 4. As another example, the macro lens can image the external ear, at image plane 48 in FIG. 3. As a third example, the macro lens can view the face or other parts of the physiology.

The light ring 44 in FIG. 2 can take the form of a standard ring illuminator, available from photographic supply houses. Alternately, the light ring can take the form of a ring of optic fibers, illuminated by the same light source which illuminates the otoscope 20.

Rhino-Laryngoscope

A fourth instrument is a rhino-laryngoscope 50 shown in FIG. 2. This instrument is an endoscope used to view internal organs of the physiology, such as the throat, as indicated in FIG. 5. The rhino-laryngoscope 50 attaches to the remote imaging head 6 in FIG. 2 by mounting adapter 15, and is illuminated by a fiber-optic cable 51, and the cable is illuminated by the same light source which illuminates the fiber optic cable used for the ophthalmoscope. FIG. 1A illustrates the receptacle 55 into which a fiber optic cable is inserted for the respective instruments 30 and 50.

Fundus Camera

A fifth instrument is a fundus camera 60 shown in FIG. 2. This camera is used to image the fundus of the eye where the retina is located. A commercially available fundus camera is used, and the camera is ordinarily affixed to the camera back 64 of a 35 mm camera. The invention replaces the camera back 64 with the mounting adapter 15D which mounts the fundus camera to the imaging head 6, rather than to the camera back 64.

The most common use of the fundus camera is to view the retina near the plane 33 in FIG. 4. The fundus camera is not shown in FIG. 4, but would be located approximately in the position of the ophthalmoscope 30. The fundus camera 60 may also be used by withdrawing the fundus camera from

the eye and changing the focus, thereby allowing the fundus camera to view the external eye, at image plane 46.

The fundus camera adapter 15D in FIG. 2 contains a 10 mm C-mount spacer and an achromatic lens, for viewing the fundus. In addition, to view the external eye, a 5 mm spacer can be added, for increased magnification.

Another type of spacer 65 is shown in FIG. 2. This spacer clips to the fundus camera by means of a spring clip 66. The spacer 65 contains a soft, pliant bulb 67 at its end, which contacts the subject's forehead. The spacer prevents accidental contact between the fundus camera and the eye itself. The 35 mm camera back 64 is optional, as indicated, and may be included within the valise 2, if desired.

Mode of Illumination

In the most general case, it is not critical whether a given instrument is illuminated by (a) electric power supplied by a power supply within the valise 2, which powers the instrument's own lamp or (b) a fiber optic cable, illuminated by a light source within the valise.

Display of Images

As stated above, the video camera 3 allows the images taken by the instruments shown in FIG. 2 to be displayed on the video display 25. The display presents the image seen by the video camera 3, such as the retina of the eye imaged by the ophthalmoscope 30. A significant feature of the imaging sub-system is that, in general, the image presented on the display 25 will be magnified, compared with the actual size of the physical object viewed.

Audio System

The valise 2 contains an electronic stethoscope 70, shown in FIGS. 1 and 6. The stethoscope is equipped with a piezoelectric crystal microphone 72 which produces an analog signal 74. As indicated by block 75, this signal can be conducted directly to an output jack mounted on the valise 2 for transmission to a remote site.

Alternately, the analog signal 74 can be converted to a digital signal 76 by Analog-to-Digital converter (A/D) 78. The digitized signal 76 is either stored internally, or transmitted by telephone modem, as indicated by block 79.

Two reasons for digitizing the stethoscope signal are the following. One is that the common-carrier telephone system is limited in bandwidth, from about 300 Hz to 3,000 Hz. However, audio signals produced by the human physiology, such as by the heart, lung, and intestinal system, which are detected by the stethoscope 70, can range in frequency from about 20 Hz to 1,500 Hz.

This frequency range exceeds the bandwidth of the common-carrier telephone system. Digitizing the analog signal allows transmission over the common-carrier telephone system, without loss of information (although the time required for transmission increases). A standard modem can be used. Digitizing of analog signals is known in the art.

A second reason is that storage of digital signals is quite simple, using modern computers. Use of a computer will be discussed below.

Data Sub-System

FIG. 7 illustrates two components of the data sub-system implemented by the invention. The first component is a pulse oximeter 104 which includes a finger probe 108 and processing electronics 105. The pulse oximeter 104 measures the oxygen saturation percentage (ie, Sp02) within the subject's bloodstream, as well as heart rate. The output is visually displayed on a Liquid Crystal Display (LCD) 109, also shown in FIG. 1A, and also made available in digital form to a serial RS-232 connector, as indicated.

The second component of the data sub-system shown in FIG. 7 is an ElectroCardio-Gram (ECG) monitor 119 which includes ECG leads 121. The ECG monitor 119 receives data from the leads 121 which are placed in contact with the subject. As with the pulse oximeter, the data is visually displayed on an LCD display 125, also shown in FIG. 1A, and presented to a second serial RS 232 output port, as indicated.

Two additional components can be added to those discussed in FIG. 7. One is a blood pressure sensor BP, which takes blood pressure of a subject, and produces digital data indicative of the pressure. The second is a body temperature sensor, TEMP, which takes body temperature of the subject, digitizes the temperature, and produces digital data indicative of the temperature. The digital output of both these components is fed to the serial output connector 106 in FIG. 8, or otherwise processed in an appropriate manner. Such blood pressure sensors and body temperature sensors are commercially available.

Design Architecture of Two Forms of Invention

First Architecture

FIG. 8 illustrates an architecture of one form of the invention. The stethoscope audio pick-up 72, also shown in FIG. 6, delivers an audio signal to an analog output connector 100. (Intervening electronics, if used, are not shown for simplicity.) The pulse oximeter 104 and ECG monitor 119, also shown in FIG. 7, deliver their signals to two serial data output connectors 104. Also, their signals are displayed visually on respective LCD displays 109 and 125.

The CCD camera 3, also shown in FIG. 2, produces the image which it views on the video display 25, also shown in FIG. 2. In addition, the CCD camera's NTSC analog signal is presented directly to a jack 213, such as a standard BNC connector.

All of the equipment shown in FIG. 8 is packaged within the valise 2 of FIG. 1. The connectors 100, 106, and 213 are used by associated equipment to transmit data to a remote location.

Second Architecture

FIG. 9 illustrates an architecture of another form of the invention. All of the equipment identified in FIG. 9 is packaged within the valise 2 of FIG. 1.

The invention includes a computer 150, which can take the form of a single-board computer conforming to the AT/XT architecture, developed by IBM corporation, Armonk, N.Y., which is based on the 8XX86 microprocessor, developed by INTEL Corporation, Santa Clara, Calif. This AT/XT architecture is commonly used by the so-called "Personal Computer," or "PC".

Such single-board computers accept expansion cards, which interface with the system bus 155. Three such cards are shown:

(1) An audio card 160 (such cards are commonly called Digital Signal Processing (DSP) boards);

(2) A data I/O (Input/Output) card 170; and

(3) A video grabber card 180, also called a "frame grabber".

The audio card 160 receives the analog output of the stethoscope pick-up 72 and converts this analog output into digital format. The audio card performs the A/D function indicated in FIG. 6, as well as other functions.

The audio signal produced by the pick-up 72 can also be routed to a separate digitizing apparatus 161, as indicated. This digitizing apparatus shares a connector 163 with the pulse oximeter 104 and the ECG monitor 119, via multiplexer 162. The connector 163 produces digital output indicative of the signals produced by the stethoscope, the pulse oximeter, and the ECG monitor, multiplex fashion, for transmission to a remote site.

The data I/O card 170 receives digital data from the pulse oximeter 104 and the ECG monitor 119, and presents the respective digital signals to the system bus 155. The video grabber card 180 receives the NTSC signal from the CCD camera 3, digitizes the data, and presents it to the system bus 155. The motherboard 190, which contains the microprocessor, stores the data received by the cards 160, 170, and 180, in mass storage 205, or otherwise processes it, as appropriate. The video data, received by the video grabber card 180, can be displayed on the video display 25, by a video driver card 210. In addition, as indicated by line 212, the NTSC analog video signal is delivered directly to a video jack 213.

The data received by all cards 160, 170, and 180 can be transmitted along the common-carrier telephone network by a modem 215. Alternately, an optional cellular modem 225 can be used, which uses a satellite data link, through an antenna 227. The cellular modem can be advantageous in the event of natural disasters, when electric power may be in short supply.

The computer 150 can store an instruction program 230, as indicated, which contains instructions for a technician on how to use the equipment contained within the valise 2. The instructions are shown on the video display 25, and include pictures, drawings, and text, as appropriate.

In addition, the computer can include speakers 240, thereby allowing a multi-media presentation of the instructions. The speakers can be driven by the audio card 160, since many audio digitizing cards contain the ability to convert digital data to analog output. The multi-media presentation, in effect, allows a video-taped presentation of the instructions, using the display 25 for video images, and the speakers 240 for sound.

The use of the computer 150 can simplify data transmission, by storing data, and transmitting it over a longer time than its own duration. For example, if a modem is used, the bandwidth available will be restricted. The restricted bandwidth will not, in general, accomodate high-bandwidth signals, such as those produced by the video camera, or those produced by the stethoscope in certain cases. Such high-bandwidth signals cannot be transmitted in real-time over the restricted-bandwidth modem.

However, once the respective data becomes digitized, it can be stored, and bandwidth limitations, in effect, become converted to time limitations. That is, a large-bandwidth signal produces a large amount of digital data per second, compared with a small-bandwidth signal. The larger amount of digital data merely requires more time to transmit.

This increased time of transmission will not be perceived as significant by medical personnel receiving

the signals at a remote location. The highest-bandwidth signal will be that produced by the video camera 3. With suitable compression techniques, which are frames per second can be attained. Each frame can contain 640.times.480 pixels, with each pixel containing twenty-four bits of color information. Such a video rate approaches full motion video, and is acceptable for many types of medical examination.

Equipment List

The equipment listed below was used for prototype development and shown in FIGS. 2, 6, and 7 is commercially available. The equipment is available from the sources indicated below, and the instruments are normally stored within the cavities or pockets 250 within the valise 2 when the valise is being carried.

____________________________________ Equiptment Source
____________________________________ Otoscope 20 Welch-Allyn Skaneateles Falls, NY Ophthalmoscope 30 Welch-Allyn Video Camera 3 (Model 8280) Cohu, San Diego, CA Rhino-Laryngoscope 50 Olympus America, (Model ENF-P3) Irving, TX Fundus Camera 60 (Model RC-2) Kowa Company, Ltd., Japan Electronic Stethoscope 70 Andries Tek, Austin, TX Pulse Oximeter 104 Siemens Med. Electronics, (Model Micro O.sub.2) Danvers, MA ECG monitor 119 (Biolog) Micromedial Industries Northbrook, IL TFT Monitor 25 (Model 9M-60U) Sharp Electronics Corp. Mahwah, NJ Audio Card 160 Creative Labs Melpitas, CA Data I/O Card 170 National Instruments Video Grabber 180 Play, Inc. Rancho Cordova, VA Single-Board Computer 150 Adastra Systems, Hayward, CA Macro lens (C6X18G) Scientific Systems Arlington, TX

____________________________________

Definitional Matters

"Video": The term "video camera" should not be construed as necessarily requiring full-motion video, such as 30 frames-per-second, or faster. "Video" is a generic term, used to refer to an imaging device which can produce signals suitable for display on a video monitor, such as a television or a computer display. Thus, a "video" camera can take still photographs, full-motion photographs, or ranges of motion between these two.

"Portable." One definition of "portable" is that it can be carried by hand. Another definition of "portable" includes the requirement that the apparatus be transportable as carry-on luggage in standard commercial aircraft.

"Electrocardiogram": One definition is that the electrocardiogram is a "graph," as the name implies, of electrical impulses taken from the skin, at specific locations, and in a specific manner, which represents electrical activity of the heart.

Numerous substitutions and modifications can be undertaken without departing from the true spirit and scope of the invention. What is desired to be secured by Letters Patent is the invention as defined in the following claims.

* * * * *

Images

View Cart Add to Cart

Hit List | Previous | Top

Home | Quick | Advanced | Pat Num | Help

**State of Louisiana**

**Department of Health & Hospitals**

**Office of Behavioral Health**

**Request For Information (RFI)**

**For**

**Provision of Forensic Services**

**October 12, 2010**

Version: 1.0

Date: 10/12/2010

RFI Number: XXX

## Contents

**Confidentiality**........3

**Introduction**........4

*About the Office of Behavioral Health*........4

*About the Forensic System*........5

**Statement of Need**........7

**Purpose of the RFI**........9

**Scope**........9

Requirements........10

**RFI Response**........12

Outline........12

**Abbreviations and Terminology**........13

**RFI Procedure**........13

How to Deliver the Response........14

Timeframe........14

**Sample Cover Page**........15

## Confidentiality

The designation of certain information as trade secrets and/or privileged, confidential, or proprietary information shall only apply to the technical portions of this Request for Information. *Any response to this request marked as copyrighted or marked as privileged, confidential, or proprietary* ***in its entirety*** *is subject to rejection without further consideration or recourse* based on the professional opinions of Department of Health & Hospitals (DHH) legal staff.

Respondents should bear in mind that while trade secrets and other proprietary information submitted in conjunction with this RFI may not be subject to public disclosure, ***the submitting party must claim protections at the time of submission***. The following guidelines provide accurate instructions to mark adequately certain information as privileged, confidential, or proprietary.

- The respondent must clearly designate the part of the response that contains a trade secret and/or privileged or confidential proprietary information as "confidential" in order to claim protection, if any, from disclosure. The respondent shall mark the cover sheet of the response with the following legend, specifying the section(s) of the response sought to be restricted in accordance with the conditions of the legend:

  *"The data contained in pages ______ of this response have been submitted in confidence and contain trade secrets and/or privileged or confidential information, and such data shall only be disclosed for evaluation purposes. This restriction does not limit the State of Louisiana's right to use or disclose data obtained from any source, including the proposer, without restrictions."*

- Further, to protect such data, respondents should identify and mark each page containing such data as "CONFIDENTIAL." A watermark or footnote delineating each page containing such data as "confidential" will satisfy this requirement.

Respondents must be prepared to defend the reasons why material should be held as confidential. If another respondent or entity seeks to review copies of a respondent's confidential data, DHH will notify the owner of the asserted data of the request. If the owner of the asserted data does not want the information disclosed, it must take legal action as necessary to restrain DHH from releasing information DHH believes to be public record.

If the response contains confidential information, the respondent should submit a redacted copy of the response. Without the submission of a redacted copy, DHH may consider the entire response to be public record. When submitting the redacted copy, it should be clearly marked on the cover as a "REDACTED COPY." The redacted copy should also state which sections or information have been removed."

# Introduction

## About the Office of Behavioral Health

***Mission***. The mission of the Office of Behavioral Health is to promote recovery and resiliency through services and supports in the community that are preventive, accessible, comprehensive and dynamic.

***Vision***. The Office of Behavioral Health ensures care and support that improves quality of life for those who are impacted by behavioral health challenges.

***Guiding Principles***.

- We can and will make a difference in the lives of children and adults in the state of Louisiana.
- People recover from both mental illness and addiction when given the proper care and a supportive environment.
- The services of the system will respond to the needs of individuals, families and communities, including culturally and linguistically diverse services.
- Individuals, families and communities will be welcomed into the system of services and supports with a "no wrong door" approach.
- We respect the dignity of individuals, families and communities and the workforce that serves them.
- Through a cooperative spirit of partnerships and collaborations, the needs of individuals, families and communities will be met by a workforce that is ethical, competent and committed to the welfare of the people it serves.
- We will utilize the unique skills of professionals with appropriate competencies, credentials and certifications.
- Mental illness and addiction are health care issues and must be seamlessly integrated into a comprehensive physical and behavioral health care system that includes primary care settings.
- Many people we serve suffer from both mental illness and addiction. As we provide care, we must understand, identify and treat both illnesses as primary conditions.
- The system of care will be easily accessible and comprehensive and will fully integrate a continuum of prevention and treatment services to all age groups. It will be designed to be evidence-based, responsive to changing needs, and built on a foundation of continuous quality improvement.
- We will measure our results to demonstrate both improved outcomes for the people we serve and fiscal responsibility to our funders. We will prioritize de-stigmatizing historical biases and prejudices against those with mental illness and substance use disorders, and those who provide services, through efforts to increase access to treatment. We will

do this by reducing financial barriers, addressing provider bias, integrating care and increasing the willingness and ability of individuals to seek and receive treatment.

## About the Forensic System (Flow Chart Attachment #1)

The Forensic System in Louisiana is composed of several different administrative units. The forensic inpatient program is housed at East Louisiana Mental Health System (ELMHS) with patients in both the ELMHS civil unit and Feliciana Forensic Facility. These consist of patients who are incompetent to proceed to trial (ITP or pre-trial), those who have been determined to be unrestorable, and those who are not guilty by reason of insanity (NGBRI). In addition, the Department of Health and Hospitals (DHH) funds the Community Forensics Services program which provides services to individuals who are ITP and in jail either for competency restoration, or individuals who are ITP or NGBRI and awaiting hospitalization. The Community Forensics Program also provides services to NGBRI individuals on conditional release after discharge from the hospital, and individuals who are ITP and allowed to remain in the community,

### Community Forensics Services (CFS)

The Community Forensics Services Program is directed by an attorney and employs District Forensic Coordinators (DFCs) for every region in the state. There are currently nine DFCs in the state who provide jail-based competency restoration, community-based competency restoration for ITPs, and case management and monitoring for those NGBRIs who are conditionally released by the Court. In addition, they maintain regular communication with the Court regarding the status of the individual.

Defendants who are ITP are typically ordered to DHH custody for either the 90-day jail-based competency restoration program or to the inpatient competency restoration program. Those ordered to inpatient competency restoration remain in jail until a hospital bed is available. The wait time for hospitalization is currently over 100 days; however, a recent federal judgment against DHH has made it imperative that the waiting list be shortened significantly. While in jail, all ITP defendants receive services from the District Forensic Coordinator (DFC) in that region. Traditionally, approximately 30% of ITPs have been restored while in jail. The remaining 70% have been hospitalized... Of those hospitalized, 60% have typically been restored in the hospital within 110 to 120 days of admission. Because of demanding schedules, DFCs usually have time to work with defendants who are in jail on average once or twice per month for competency restoration. The goal is for defendants to receive competency restoration two to three times a week, which would increase the number of individuals who could be restored while in jail; thus removing them from the hospital waiting list. Preliminary estimates are that this would require the addition of seven additional DFCs throughout the state. OBH currently is in the process of adding SEVEN additional DFCs to provide the necessary .

In addition to the DFCs, the New Orleans Forensic Aftercare Clinic (FAC) falls under the umbrella of Community Forensic Services and works with the Court to meet the treatment and safety needs of conditionally released individuals, as well as community based ITPs. The FAC

employs District Forensic Coordinators, a Substance Abuse Counselor, social workers, case monitors, psychiatrists, and psychologists. These individuals provide competency restoration, treatment planning and treatment, case monitoring, and referrals to additional services (i.e., housing and medical). They also inform the Court of the individual's adherence to the court order.

### Inpatient Forensics Program

ELMHS Forensics Division consists of ASSA, the maximum security and admissions units with 75 beds. The CRU minimum-security units have 72 beds, and the ITU medium security units have 88 beds for a total of 235 beds. All units are currently at capacity. In addition, DHH has recently developed and is in the process of implementing a secure forensic facility (SFF), which is designed to serve patients who are able to function with fewer staff. Currently the facility has 25 patients with a capacity for 82.

Individuals ordered to the hospital for NGBRI or ISP services are first placed in the ASSA where they are evaluated and appropriate placement is determined. They are then transferred to the unit that best meet their needs. NGBRI patients are reviewed a minimum of every two years and recommended for continued hospitalization or discharge to the community. If discharge is recommended, the Court may agree or may order continued commitment. When both the hospital and the Court agree that the patient is ready for discharge, the Court orders conditional release usually for five years. The individual may be discharged to a family member, but is typically released to a transitional residential facility in the community. Upon release, the DFC, who provides monitoring and tracking of the individual in the community, makes regular reports to the Court as to the status of the individual.

Individuals committed to DHH, who are designated ITP, are placed on the waiting list in jail until they can be transferred to Feliciana Forensic Facility, where they receive mental health treatment—including psychiatric treatment—as well as competency restoration treatment. Once competency is restored and the Court agrees, the individual is returned to jail to await trial. The DFC provides services to this individual in jail, monitoring mental status and assisting the individual in maintaining competence. Because psychiatric treatment is less intensive in the jail, these defendants may decompensate and have to be returned to the hospital prior to trial.

For many ITPs, competency restoration is not possible. In these cases, an evaluation is completed to determine if a) the patient should be civilly committed or, if not committable, b) released with notification of the court. This procedure is in accord with Louisiana Code of Criminal Procedure Article 648(B). If committed, the patient is transferred to a civil unit and remains there until the hospital treatment team determines inpatient treatment is no longer needed. The patient is then released to the community and no longer receives services from DHH. (Please see Attachment 1 for a diagrammatic representation of the DHH forensic program services.)

The ELMS Forensic Division employs a full staff of psychiatrists, physicians, nurses, social workers, recreation therapists, other treatment staff and direct care staff who develop treatment

plans, assess the patient and communicate with the Court regarding the status of the resident. The psychiatric services are provided by contract with Tulane University School of Medicine, department of psychiatry. At present the Tulane contract includes a Chief of Staff, three Assistant Clinical Directors and 18 psychiatrist positions that take care of over 600 forensic and civil patients on two campuses. Clinicians evaluate, treat, testify in court and report and publish outcomes and findings. ELMHS is the first state facility in the country to study the use of telemedicine in competency evaluation and restoration and to use jail-based competency restoration. Psychiatrists, psychologists, nurses and social workers are trained in collaboration with all of the major university systems in the state. Tulane sponsors and stages a major teaching conference each year, the French Quarter Symposium, which attracts national speakers in forensic psychiatry and trains psychiatrists and mental health professionals throughout the state.

ELMHS in collaboration with Tulane University has been able to maintain JCAHO accreditation for the hospital and ACGME accreditation for the training program.

### Juvenile Competency Restoration

The juvenile competency restoration program has one DHH employee as the coordinator and currently utilizes employees of the Regional Mental Health Centers, Developmental Disability programs, and inpatient facilities to provide competency restoration services (to juveniles). Juveniles who are found incompetent to proceed are either ordered to outpatient competency restoration or to DHH custody for inpatient competency restoration. Those in the outpatient program are served at the local mental health center or offices for developmental disabilities and receive restoration services at least once per week. Competency is typically restored within 90 days. The competency restoration provider communicates with the courts on a monthly basis concerning the juvenile's status. Additional time may be requested when the youth has not yet become competent; however, youth who are unlikely to become competent are referred back to the court. For youth who are in need of closer supervision than the home can provide or who are in need of inpatient mental health or development disability services are placed in a state hospital or residential facility for individuals with development disabilities until they become competent. Louisiana Children's Code mandates that DHH train and certify juvenile competency restoration providers throughout the state. These providers must be recertified every two years. Currently there are 68 certified juvenile competency restoration providers. [NOTE: DHH, the Louisiana Department of Education, the Louisiana Office of Juvenile Justice and the Louisiana Department of Children and Family Services are collaborating to develop a Comprehensive System of Care (CSoC) to provide mental health services to youth at risk of out of home placement as well as other selected consumers. Some ancillary services often associated with juvenile competency restoration, such as psychiatric hospitalization, will be provided within the CSoC. To date the CSoC planning group has not decided whether the actual juvenile competency restoration services, themselves, will be provided by CSoC.]

## Statement of Need

Individuals diagnosed with behavioral health issues (i.e., mental health and addictive disorders) and determined by the courts to be ITP or NGBRI are ordered to competency restoration and/or treatment either in the community, in jail, or in a secure forensic facility. Adults ordered to DHH custody for inpatient treatment are typically placed in the jail to await a forensic hospital bed, which may take up to one year. District Forensic Coordinators (DFCs) are responsible for attempting to restore individuals to competency while in jail, thereby diverting them from the hospital. As previously noted, DFCs are currently unable to meet with clients frequently enough to restore competency to more than a third of the jail based competency clients. In addition, many individuals in the jail needing competency restoration are psychotic and refuse to comply with treatment. Jails do not force clients to comply, meaning these individuals do not have their treatment needs sufficiently met and are unable to benefit from competency restoration services. This situation exacerbates clients' mental deterioration and increases their need for an inpatient bed where treatment can be administered without consent and where individuals receive the recommended 2-3 times a week competency restoration services. These deficiencies result in a backlog of individuals who are in jail waiting to be transferred to the hospital. Once individuals are moved to the hospital, they often remain at the hospital level of care for an extended period after reaching maximum benefit, due to limited placement options in the community, reluctance of the courts to release serious offenders to the community and their inability to be restored to competency.

DHH is currently going through a three phase plan to address issues identified in a recent federal lawsuit related to the long waiting period from jail to hospital. In phase 1, 51 individuals were moved from jail to the hospital. Phase 2 is scheduled to be completed by November 2010 for 60 clients with 10 remaining to be hospitalized in December. Phase 3 is a continuing process with an anticipated 13 to 14 clients per month being transferred from jails to the hospital. This process has required an evaluation of all hospitalized patients who could possibly be considered for discharge to a less restrictive setting, such as the transitional residential facility managed by a contract provider. Transfer of hospital patients to step-down residential care provides additional hospital beds for jail-based restoration clients.

*The DHH goal is to provide more comprehensive and effective services for these individuals that will prepare them for transition to a less restrictive environment and/or back to the Court in a shorter period. To this end, the Office of Behavioral Health seeks a provider with the ability to refine the current services, develop new services as needed and provide administrative and financial responsibility for all Louisiana State Forensic programs. This includes but is not limited to:*

- o *Administering the Forensics Services Program, including all legal aspects such as communicating with the courts, writing court orders, testifying in court, and recruiting psychologists and psychiatrists to provide hospital-based, community-based and jail-based competency evaluations and patient care. This includes:*
    - *Managing the current DFCs and hiring additional DFCs to provide all services within their job descriptions with the frequency recommended by the most recent research and best practices*
    - *Administering the Forensic Aftercare Clinic in New Orleans*

- *Administering all community-based forensic procedures*
  - *Administering all aspects of the state forensic facility (FFF)*
  - *Providing both mental health and physical care services to hospitalized patients, including usual and necessary services to maintain hospital accreditation status and to ensure treatment focus on patient recovery*
- *Developing a method for ensuring that individuals committed to DHH who are housed in local jails comply with treatment*
- *Developing relationships with providers to increase the number of community resources for housing, etc. for conditionally released individuals*
- *Developing an MOU with OBH and with community partners who provide residential services so that Lockhart in-patients who are civilly committed can have access to civil intermediate hospital beds and step-down residential beds to facilitate patient flow necessary to handle demand for hospital services.*

## Purpose of the RFI

The Louisiana Department of Health & Hospitals, Office of Behavioral Health, issues this Request for Information (RFI) with the intent to determine the interest and capabilities of provider organizations to provide forensic services on behalf of the state.

This document describes the basic components of the current forensic system and requests information regarding a provider's thoughts, interest and ability to meet the La. forensic requirements, the expectations of the Office of Behavioral Health, the Department of Health & Hospitals, and Federal Court requirements. The RFI will be used for planning purposes only, and should not be construed as a Request for Proposals (RFP). This document does not represent a solicitation for offers from private parties or other entities. Should an RFP be issued, response or non-response to this RFI will not in any way be considered in the evaluation and award of the RFP.

## Scope

The scope of work indicated by this Request for Information is to provide a system of care for individuals remanded to DHH custody who are designated Not Guilty by Reason of Insanity (NGBRI) or Incompetent to Proceed (ITP) or who have been civilly committed after restoration attempts have failed and who are either community-based or in the hospital. These services include a Community Forensics Program for adults, forensic hospital services for adults needing secure, supervised living arrangements, and both outpatient and inpatient juvenile competency restoration. As noted in the "About the Forensic System" section, the components of the system must include:

***Inpatient Competency Restoration***. Individuals found "Incompetent to Proceed" and ordered by the Court into DHH custody are placed in a hospital setting for psychiatric treatment with the goal of competency restoration. Treatment continues until the individual either regains competency or is determined to be unrestorable. Individuals who are unable to regain

competency return to the Court for a change of status. There are currently 112 individuals who are receiving inpatient competency restoration.

***Outpatient Competency Restoration***. The Court finds some individuals "Incompetent to Proceed" whose conditions do not warrant inpatient treatment. Typically, these individuals do not present a danger to themselves or others. Conditional release to the community where they are provided outpatient services through DHH, with the goal of competency restoration is possible for these individuals. The District Forensic Coordinator (DFC) provides competency restoration and coordinates services for these individuals. Eighteen individuals are currently receiving outpatient competency restoration.

***Jail-Based Competency Restoration***. The District Forensic Coordinator provides competency restoration services for those individuals found "Incompetent to Proceed" and ordered to the 90-day jail-based competency restoration program. Individuals who regain competency within the span of the 90-day program return to the Court. Individuals who do not regain competency most often transfer to Inpatient Competency Restoration services. Approximately 150 individuals are currently receiving jail-based competency restoration services.

***Not Guilty By Reason of Insanity (Hospitalized)***. Individuals found "Not Guilty By Reason of Insanity" (NGBRI) by the Court, whose conditions warrant inpatient treatment, are placed in a hospital setting until their treatment is complete. Upon discharge from the hospital setting, they most often are placed on supervised probation through the local Probation and Parole office, and receive case management services from the District Forensic Coordinator for a specified time. Failure to follow the conditions of their release may result in a return to the hospital setting. Currently 130 NGBRIs are hospitalized.

***Not Guilty By Reason of Insanity (Community-Based)***. Individuals found "Not Guilty By Reason of Insanity" (NGBRI) by the Court, whose conditions do not warrant inpatient treatment, are placed in supervised probation in the community. The District Forensic Coordinator monitors these individuals for a specified time. Currently 18 NGBRI are receiving services in the community.

***Inpatient Juvenile Competency Restoration***. When the Court believes a direct return to the community is inappropriate, the Court may order juveniles found "Incompetent to Proceed" into DHH custody. These youth find placement in a hospital setting or a facility for youth with developmental disabilities, where they receive treatment services and education, with the goal of competency restoration. Once the youth have completed competency restoration, they return to the Court. There are currently 6 youth receiving competency restoration services in either the hospital or developmental disability facility.

***Outpatient Juvenile Competency Restoration***. The Court may order Juveniles found "Incompetent to Proceed" to attend outpatient juvenile competency restoration without placement in DHH custody. These youth receive competency restoration services in the community through DHH juvenile competency restoration providers. Once these youth have completed the competency restoration program, they return to the Court. Five youth are currently receiving outpatient restoration services.

### Requirements

In addition to the components noted above, the forensic program should, at a minimum, include the following services for NGBRI, ITP, and unrestorable incompetent individuals (who are civilly committed):

1) Secure, supervised psychiatric setting for adult NGBRI and ISP patients with adequate staff to meet treatment needs and legal/competency requirements
   - Primary medical care
   - Specialty medical care through community partners
   - Psychiatric care
   - Multiple assessments
     - Psychiatric
     - Psychosocial
     - Nursing
     - Chemical dependence
     - Risk assessment
   - Integrated Treatment of mental illness, addictive disorders, and developmental disabilities
     - Pharmacotherapy (all pharmacy services)
     - Individual therapy
     - Group therapy
   - Competency Restoration
   - Communication with the court
   - Discharge and aftercare planning
   - Assistance with ID and benefits at discharge

2) Adult community forensic services program that provides:
   - Multiple assessments:
     - Psychiatric
     - Psychosocial
     - Nursing
     - Chemical dependence
     - Risk assessment
     - Psychological testing
   - Integrated treatment of mental illness, addictive disorders, and developmental disabilities
     - Pharmacotherapy
     - Individual therapy
     - Group therapy
     - Drug screens (hair tests)
     - Referrals for more intensive substance abuse treatment
     - Monitor ongoing recovery programs (i.e., presence of a sponsor and regular 12 step meeting attendance)
     - Medication assistance
     - Referral for primary physician care
   - Case monitoring and supervision
     - Home visits
     - Crisis intervention
     - In-office

- Assistance with ID and benefits

- Competency restoration
  - 90-day jail-based competency restoration
  - Community based

- Communication with the legal system, including Judges, District Attorneys and Probation Officers
- Continuity of care
  - Discharge and aftercare planning

3) Juvenile competency restoration program
   - Outpatient
   - Inpatient psychiatric hospital
   - Inpatient developmental disability facility

## RFI Response

Companies interested in responding to this RFI must submit a capability statement of no more than 20 pages that details the ability to meet the statement of need. The following information is required in the response:

- Date of Submission
- Name of Organization
- Mailing Address
- Contact Information
- Printed Name & Title of Authorized Representative
- Signature of Authorized Representative

For your convenience, a sample cover page has been appended to the final section of this RFI document. Although this cover page is not required, its use is recommended to ensure uniformity of response and submission of all required information noted above.

### Outline

1. Respondents should demonstrate comprehensive experience in working with adult and juvenile forensic clients with serious mental illness and/or co-occurring substance abuse and developmental disabilities in community, jail, and inpatient settings.

2. Respondents should demonstrate knowledge and prior implementation of evidence-based programs for forensic clients.

3. Respondents should demonstrate organizational viability, providing examples of specific customers, contact information, and assessments of program performance.

4. Respondents should demonstrate capacity to recruit staff and implement community, jail-based, and inpatient programs on a rapid timeframe.
5. Respondents should provide biographical information of Principals involved in the organization.
6. Respondents should demonstrate where applicable current involvement and linkages with court, law enforcement and probation system and other relevant community organizations in the communities they currently serve.
7. Respondents should demonstrate the necessary structure for governance, administrative, and budgetary stability.
8. Respondents should discuss previous experience integrating services with academic teaching programs for physicians and other clinicians.
9. Additional materials may be included as attachments and must be clearly labeled as such. These may include annual reports, marketing materials, case studies, research papers, etc.

## Abbreviations and Terminology

| | |
|---|---|
| **Community-Based** | *Refers to treatment services provided in the community rather than a hospital or other inpatient setting.* |
| **Competency** | *Legal term allowing the postponement of criminal proceedings for those defendants who are unable to participate in their defense on account of mental illness, mental retardation, or physical illness.* |
| **Competency Restoration** | *A formal treatment and/or educational process designed to help defendants involved in criminal proceedings regain the ability to participate in their own defense.* |
| **DFC** | *Master's level mental health professional who provides both jail based and community based competency restoration, as well as client monitoring and tracking.* |
| **DHH** | *Department of Health & Hospitals* |
| **Inpatient** | *Treatment services offered in a hospital.* |
| **ITP** | *Incompetent To Proceed (see "competency" above)* |
| **NGBRI** | *Not Guilty By Reason of Insanity. Refers to a judgment by the Court that an individual is not mentally competent to stand for sentencing and/or punitive measures.* |
| **Outpatient** | *Treatment services delivered in a community-based setting such as an outpatient clinic. Patients attend these services as scheduled and required by the Court.* |
| **OBH** | *Office of Behavioral Health* |
| **RFI** | *Request for Information* |
| **RFP** | *Request for Proposals* |

## RFI Procedure

If your organization is interested in providing information on your ability to perform the requested services for the Office of Behavioral Health's Forensic System, please submit an electronic Microsoft Word copy of your response to the contact listed below. The Department may invite qualified organizations to make oral presentations and participate in an individual question-and-answer session concerning their responses. Organizations should indicate in their responses whether they are willing to participate in these sessions. All organizations who have the interest and capacity to fulfill the activities specified in this RFI should respond **no later than 4:00 P.M. (Central Time) on Friday, November 30, 2010.**

### How to Deliver the Response

In response to this Request For Information, please send a Microsoft Word-formatted response via email to sue.austin@la.gov. Please direct questions regarding this Request for Information to the following point of contact:

Sue Austin, Ph.D.
*Forensic Coordinator Adult and Juvenile Services*
(225) 342-9965
Sue.austin@la.gov

**Timeframe**

The following table designates the target dates for the request for Information (RFI) process. Please note that this RFI does not constitute a solicitation of offers from private providers or other entities. The purpose of an RFI is to gather information and gauge interest in a Request for Proposals process. The dates listed below are target dates, and subject to change without notification.

| | |
|---|---|
| October 12, 2010 | RFI distributed to potentially interested parties |
| October 22, 2010 | Last day for RFI questions |
| November 12, 2010 | Responses posted by DHH/OBH to questions |
| November 30, 2010 | Last day for submission of responses to RFI |

**Competency Restoration Process Client/Patient Flow**



# Name of Organization

Response to
Office of Behavioral Health
Request For Information
For

# Provision of Forensic Services

Submitted on:

## Month 00, 2010

## REDACTED COPY

*The data contained in pages _____ of this response have been submitted in confidence and contain trade secrets and/or privileged or confidential information, and such data shall only be disclosed for evaluation purposes. This restriction does not limit the State of Louisiana's right to use or disclose data obtained from any source, including the proposer, without restrictions.*

Name of Organization
00000 Mailing Address
City, ST 00000-0000
Phone: (xxx) xxx-xxxx
Fax: (xxx) xxx-xxxx
Email: main@provider-email.com

Respondents are encouraged to use this page as a template for their response cover.

______________________________________________

**Name of Authorized Representative, Title**

Respondents are encouraged to use this page as a template for their response cover.

SIGNATURE CON... ...ps.com/postageonline

2308 3250 0000 7514 2381

UNITED STATES POSTAL SERVICE

PLEASE F

UNITED STATES POSTAL SERVICE

1006 70801

U.S. POSTAGE
PAID
DENVER,CO
80202
FEB 11, 12
AMOUNT
$7.70
00034319-07

# Flat Rate Mailing Envelope

**For Domestic and International Use**

***Visit us at usps.com***

By air mail / Par avion — Priority / Prioritaire

INTERNATIONAL EXPRESS PRIORITY

Any amount of mailable material may be enclosed, as long as the envelope is not modified, and the contents are entirely confined within the envelope with the adhesive provided as the means of closure.

INTERNATIONAL RESTRICTIONS APPLY:

4-POUND WEIGHT LIMIT ON INTERNATIONAL APPLIES

Customs forms are required. Consult the *International Mail Manual* (IMM) at pe.usps.gov or ask a retail associate for details.

SCREENED OF U.S. MARSHAL

From:/*Expéditeur:*
Rayfield Thibeaux
Post Office Box 1622
Denver, Colorado 80201

To:/*Destinataire:*
United States District Court
Middle District of Louisiana
Office of the Clerk
777 Florida Street, Suite 139
Baton Rouge, Louisiana 70801

Country of Destination:/*Pays de destination:*

*USPS packaging products have been awarded Cradle to Cradle Certification℠ for their ecologically-intelligent design. For more information go to mbdc.com/usps*
Cradle to Cradle Certified℠ is a certification mark of MBDC.

082708_PM_EP14F OCT 2008

Recycled

EP14F

*This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; Oct. 2008; All rights reserved.*